2000 Utah Ct. App. 023

**STATE of Utah, Plaintiff and Appellee,**

v.

**Michael Todd McARTHUR, Defendant and Appellant.**

**No. 981421–CA.**

Court of Appeals of Utah.

Feb. 10, 2000.

Joan C. Watt, Salt Lake Legal Defender Association, Salt Lake City, for Appellant.

Jan Graham, Attorney General and Joanne C. Slotnik, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges DAVIS, ORME, and WILKINS.[1]

## OPINION

ORME, Judge:

¶ 1 Michael Todd McArthur appeals his convictions for burglary, a second degree felony in violation of Utah Code Ann. § 76–6–202 (1999), and theft, a second degree felony in violation of Utah Code Ann. § 76–6–404 (1999). He argues the trial court erred in denying his motion to suppress evidence. He contends the evidence, taken by a friend from his residence and given to a police officer, was seized in contravention of his Fourth Amendment rights. We conclude defendant's rights were not violated and affirm his convictions.

## BACKGROUND

¶ 2 On March 3, 1997, a Salt Lake County home was burglarized and more than $150,-000 worth of property was stolen. Three months later, Aimee Rolfe was picked up by a patrol deputy for forging checks stolen in the burglary. Rolfe told the patrol deputy she was willing to divulge what she knew about the burglary and subsequently had several meetings with the investigating officer, Deputy Sheriff Vaun Delahunty. Rolfe provided Delahunty with incriminating information and evidence, later used by the State to obtain defendant's burglary conviction. Delahunty testified about Rolfe's involvement in the investigation at defendant's suppression hearing. Rolfe did not testify at the hearing.[2]

¶ 3 Defendant and Rolfe had been involved in an intermittent romance spanning ten years. As recently as a month before defendant's arrest, Rolfe lived with defendant and his mother in his mother's home. Around that time, Rolfe began to distance herself from defendant somewhat. She sometimes stayed over with other friends and she made plans to move in with her own mother. She returned to defendant's home periodically, however, and still kept some of her belongings there. She had never been asked to move out and was always welcome in defendant's home. Defendant's mother, who owned the home, acquiesced in defendant's hospitality toward Rolfe. In fact, it was at defendant's home that Delahunty first located Rolfe to discuss the burglary with her. Delahunty had been told Rolfe could be reached there, though he did not yet suspect defendant was involved in the burglary. Delahunty knocked on defendant's door, which was answered by defendant's young niece. Delahunty asked for Rolfe, who soon appeared. Rolfe was nervous and told Delahunty she did not want to speak to him there, but agreed to meet him at the sheriff's patrol substation the next day.

¶ 4 At the substation, Rolfe described the burglary to Delahunty in detail. She told Delahunty that, on the evening of March 3, 1997, she was with defendant and Dominick Newman when they announced they were "going to work," apparently their euphemism for committing a burglary. Rolfe and the two men then parted ways, but reunited early the next morning when Rolfe dropped by Newman's home to find defendant and Newman unloading stolen property from defendant's car. Rolfe told Delahunty what she had seen.

> She described a crystal cookie jar with a very unique gold-plated duck head on it. She described very unique Chinese vases, porcelain vases. She described numerous

---

1. Justice Wilkins heard the arguments in this case and participated in its resolution prior to his swearing-in as a member of the Utah Supreme Court.

2. Delahunty was permitted to offer hearsay testimony concerning Rolfe's statements because the rules of evidence generally do not apply to "[p]reliminary questions of fact which are to be determined under Rule 104(a)," such as the admissibility of evidence. Utah R. Evid. 1101(b)(1). *See id.* 104(a) (trial court is not bound by rules of evidence, "except those with respect to privileges," when making preliminary determinations of admissibility of evidence).

rugs, handguns ... individually cased with tops and lining, some double sets opposed to each other which she referred to as cowboy style guns. She referred to a computer. She referred to clothing which was neatly pressed and folded.

The items Rolfe described matched items reported stolen by the victim of the burglary and reinforced what Delahunty already knew about the burglary. Rolfe also correctly identified the burglarized home. She told Delahunty that, the day after the burglary, she drove Newman to the scene of the crime so Newman could retrieve a bag he had absentmindedly left behind. She accurately described damage to an automatic gate-opening device and, a few days later, directed Delahunty to the burglarized residence without difficulty.

¶ 5 During their discussions, Rolfe told Delahunty that defendant kept some of the stolen items in his home, such as a Rolex watch, a Marine Corps combat knife, a Dunhill cigarette lighter, porcelain dolls, and some crystal items, including a cigarette lighter and an ashtray. Rolfe said she was moving in with her mother and needed to retrieve her belongings from defendant's residence. She offered to pick up the combat knife and one of the crystal items while she was there. She also explained that the Rolex watch and the Dunhill cigarette lighter were unavailable because defendant wore the watch and kept the cigarette lighter in his pocket. Delahunty was receptive to Rolfe's offer, stating, "that would be great."

¶ 6 Rolfe was without transportation, so on June 30, Delahunty drove Rolfe from a friend's home to defendant's residence. When they arrived, Rolfe directed Delahunty to pull the car into the driveway and wait while she went inside. She assured him there was "no problem." Rolfe first tried to enter through the front door but, upon finding it locked, walked around to the east side of the house, where she disappeared from Delahunty's view.

¶ 7 Rolfe returned five or ten minutes later with a large plastic storage bin full of her own clothing, papers, and notebooks. She also had the crystal ashtray and the combat knife. She told Delahunty she had entered through an east door, but did not say whether she simply let herself in through an unlocked door or was invited in, though she did say that both defendant and his niece were home. She told Delahunty she had retrieved the knife from defendant's bedroom and the ashtray from a shelf in the living room. While inside, Rolfe used the stolen Dunhill cigarette lighter defendant kept in his pocket to light a cigarette. Rolfe immediately turned over the ashtray and knife to Delahunty, who referred to the knife in obtaining a warrant to search defendant's home.[3]

¶ 8 The affidavit Delahunty prepared in support of the search warrant described Rolfe's knowledge of the burglary, including her observation of defendant and Newman unloading the loot and her visit, in the company of Newman, to the scene of the crime. The affidavit also recounted Rolfe's return to defendant's residence and her retrieval of the knife. It further stated that Rolfe had observed other stolen items in the home, including the Dunhill cigarette lighter. Finally, the affidavit informed the magistrate that all of these items matched descriptions given by the victim of items stolen in the burglary. The affidavit did not inform the magistrate, however, that Rolfe had been involved in forgery, a crime of dishonesty; that she had been a potential suspect in the burglary; or that Delahunty had played a supporting role in Rolfe's obtaining the evidence, at least to the extent of driving her to defendant's residence and waiting outside while she went in.

¶ 9 The magistrate issued the search warrant and it was executed on July 3. Defendant was home when the officers arrived, and his home was searched. Many stolen items were recovered, including the Rolex watch and Dunhill cigarette lighter. Defendant waived his Miranda rights and confessed to his involvement in the burglary.

¶ 10 After the denial of defendant's motion to suppress the evidence seized in executing the search warrant, he entered a *Sery* plea, pleading guilty to the charges but preserving

---

3. Delahunty's affidavit referred to the knife and crystal lighter as having been taken by Rolfe when actually it was the knife and crystal ashtray.

his right to appeal the denial of his motion to suppress. *See State v. Sery,* 758 P.2d 935, 938–39 (Utah Ct.App.1988). He was sentenced to two concurrent prison terms of one to fifteen years, but the sentence was stayed, and he instead was ordered to serve twelve months in jail, to be followed by a term of probation.

## ISSUES AND STANDARDS OF REVIEW

¶ 11 Defendant argues on appeal that Rolfe was acting as an agent of the police when she entered defendant's home on June 30, 1998, and retrieved the stolen knife and ashtray, and, consequently, that her actions constituted an illegal search and seizure in violation of the Fourth Amendment to the United States Constitution. He argues the items seized in executing the search warrant, as well as his confession, are fruits of the prior illegal search and must be suppressed. Alternatively, defendant argues the evidence and his confession must be suppressed because Delahunty's affidavit was insufficient to establish probable cause to search because it omitted information about Rolfe's crimes of dishonesty and her involvement in the burglary, and gave the false impression that Rolfe was an altruistic citizen informant.

¶ 12 "We review the factual findings underlying the trial court's decision to grant or deny a motion to suppress evidence using a clearly erroneous standard. We review the trial court's conclusions of law based on these facts under a correctness standard." *State v. Brown,* 853 P.2d 851, 854–55 (Utah 1992). *Accord State v. Potter,* 860 P.2d 952, 955 (Utah Ct.App.1993).

## LEGALITY OF ROLFE'S "SEARCH AND SEIZURE"

### A. "Search" of Home

¶ 13 "The fourth amendment guarantee against unreasonable searches and seizures protects only against governmental actions and does not extend to the independent acts of private citizens." *State v. Watts,* 750 P.2d 1219, 1220 (Utah 1988). However, "[a] search conducted by a private person acting as [a government agent] is not a private search. In such an instance, the protections of the fourth amendment do have application[.]" *Id.* at 1221.

¶ 14 We agree with defendant that the extent of Delahunty's involvement in Rolfe's investigatory activities falls "[i]n the 'gray area' between the extremes of overt governmental participation in a search and the complete absence thereof." *Id.* Whether Rolfe was a police agent presents a close call, but it is not one we need to make. Assuming, arguendo, that Rolfe was a police agent, we conclude that she committed no Fourth Amendment violation when she entered defendant's mother's home and removed the knife and ashtray because she was in the home with his and/or his mother's permission and she did not exceed the scope of that permission.

¶ 15 Defendant's argument is similar to one addressed by the United States Supreme Court more than thirty years ago involving, of all people, Jimmy Hoffa. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Hoffa, like defendant, suffered the misfortune of unknowingly confiding in a police informant. During his trial for violations of the Taft–Hartley Act, Hoffa managed to bribe jurors to vote in his favor. *See id.* at 294–95, 87 S.Ct. at 409–10. Though the trial in that case ended in a hung jury, Hoffa was ultimately convicted of jury tampering.

¶ 16 The government's jury tampering case was strengthened considerably by an informant, a union associate of Hoffa's, who visited Hoffa's hotel suite several times during the trial and recounted to federal agents conversations Hoffa had with him and others concerning efforts to bribe jurors. *See id.* at 296, 87 S.Ct. at 410. Hoffa argued before the Supreme Court that the trial court should have suppressed the informant's testimony because Hoffa's Fourth Amendment rights were violated when the government obtained evidence against him by "deceptively placing a secret informer in [his] quarters and councils." *Id.* at 295, 87 S.Ct. at 410. Hoffa argued the informant's "failure to disclose his role as a government informer vitiated the consent that [Hoffa] gave to [the informant's] repeated entries into the [hotel]

suite, and that by listening to [Hoffa's] statements [the informant] conducted an illegal 'search' for verbal evidence." *Id.* at 300, 87 S.Ct. at 413.

¶ 17 The Court rejected Hoffa's argument, holding that the informant's gathering of evidence did not violate any right protected by the Fourth Amendment. The Court elaborated:

> Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.... "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak."

*Id.* at 302–03, 87 S.Ct. at 413–14 (quoting *Lopez v. United States,* 373 U.S. 427, 465, 83 S.Ct. 1381, 1402, 10 L.Ed.2d 462 (1963) (Brennan, J., dissenting)). *Accord United States v. Jacobsen,* 466 U.S. 109, 117–18, 104 S.Ct. 1652, 1658–59, 80 L.Ed.2d 85 (1984); *United States v. White,* 401 U.S. 745, 749, 91 S.Ct. 1122, 1125–26, 28 L.Ed.2d 453 (1971).

¶ 18 *Hoffa* established that the Fourth Amendment is not offended when a defendant's statements, gleaned during covert investigations conducted by those believed to be loyal friends, are used by the authorities to pursue a criminal prosecution. Constitutional jurisprudence has embraced the notion that "[w]hen one man speaks to another he takes ... the risk that the man to whom he speaks will make public what he has heard." *Katz v. United States,* 389 U.S. 347, 363, n. **, 88 S.Ct. 507, 517, n. **, 19 L.Ed.2d 576 (1967) (White, J., concurring). Likewise, "conduct by the defendant *inconsistent* with an expectation of privacy in a given space will operate to neutralize his protected interest therein." *United States v. Lyons,* 706 F.2d 321, 328 (D.C.Cir.1983) (emphasis in original). *See Katz,* 389 U.S. at 351, 88 S.Ct. at 511 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."). Where there is

no reasonable expectation of privacy, there is no interest protected by the Fourth Amendment.

¶ 19 The case of *United States v. Turck,* 49 C.M.R. 49, 1974 WL 14001 (A.F.C.M.R.1974), is on point, and we find its reasoning persuasive. In that court martial case, a colleague of the accused "induce[d] an invitation to the accused's premises [and] observe[d] the apparently unconcealed stolen property therein." *Id.* at 52. The court noted that "[t]he accused not only made no effort to secrete the stolen property but had, on a prior occasion, shown the property to [the informant] and voluntarily admitted that he was the thief." *Id.* The court concluded that "[s]uch circumstances clearly negate the accused's claim that [the informant's] visit constituted an unlawful invasion of his premises." *Id.* The court rejected the defendant's argument that the search warrant, obtained in part on the strength of the informant's revelations, was the product of illegally obtained information. *See id.*

¶ 20 We do not doubt that defendant would have revoked his longstanding consent to Rolfe's coming and going in his mother's home if he had known she was cooperating with Delahunty. Yet, "[t]he fact that [defendant] would not knowingly have invited a police agent to share his house does not render [Rolfe's] presence there illegal." *United States v. Baldwin,* 621 F.2d 251, 253 (6th Cir.1980), *cert. denied,* 450 U.S. 1045, 101 S.Ct. 1767, 68 L.Ed.2d 244 (1981). The Constitution tolerates undercover investigations by informants who conceal their status as police agents. *See White,* 401 U.S. at 752, 91 S.Ct. at 1126; *Lewis v. United States,* 385 U.S. 206, 210, 87 S.Ct. 424, 427, 17 L.Ed.2d 312 (1966). Contrary to defendant's assertion, Rolfe's hidden agenda does not render her presence in defendant's home illegal. *See Baldwin,* 621 F.2d at 253. "[A] privacy interest, in the constitutional lexicon, consists of a reasonable expectation that *uninvited* and *unauthorized* persons will not intrude into a particular area." *Lyons,* 706 F.2d at 325 (emphasis added). It follows that the Fourth Amendment has no application to the actions of *invited* and *authorized* persons, even when, unbeknownst to the unwary, they

are acting as police agents.[4] *See State v. Koury*, 824 P.2d 474, 478 (Utah Ct.App.1991) ("It is not illegal for a private individual, even if acting as a government agent, to enter another's home if he or she does so with the owner's permission."). "The choice of [defendant] to open [his] otherwise private areas to the view of an undercover informant can be thus viewed as creating an area outside the protection of the Fourth Amendment." *People v. Catania*, 427 Mich. 447, 398 N.W.2d 343, 347 (1986).

¶ 21 In *State v. Koury*, this court concluded that it was lawful for an informant, who had been given a key to the defendant's home and asked to care for his pets while he was away, to report his observation of illegal drugs in the home. *See* 824 P.2d at 476, 478. The circumstances establishing consent are equally compelling here. Defendant welcomed Rolfe into his private sphere and candidly exposed to her the fruits of his illegal activities. On the day she retrieved the ashtray and knife, far from barring her entry, it appears defendant graciously hosted her, allowing her to light a cigarette with the stolen Dunhill lighter he kept in his pocket. The risk that Rolfe would choose to cooperate with authorities and reveal what she saw and heard was borne by defendant alone. The Fourth Amendment offers no protection from the consequences of defendant's misplaced trust. *See Jacobsen*, 466 U.S. at 117–18, 104 S.Ct. at 1658–59; *White*, 401 U.S. at 749, 91 S.Ct. at 1125; *Hoffa*, 385 U.S. at 302–03, 87 S.Ct. at 413–14; *Lyons*, 706 F.2d at 329.

### B. "Seizure" of Evidence

¶ 22 Though the Fourth Amendment allows undercover police agents to conduct warrantless searches in places to which they have been invited, the Fourth Amendment requires that the search not exceed the scope of the invitation, *see Lewis*, 385 U.S. at 211, 87 S.Ct. at 427–28; *United States v.*

*Scherer*, 673 F.2d 176, 182 (7th Cir.), *cert. denied*, 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982); *Catania*, 398 N.W.2d at 349, and demands that seizure of evidence in such a warrantless search be justified by one of the "specifically established and well-delineated exceptions" to the warrant requirement. *Katz*, 389 U.S. at 357, 88 S.Ct. at 514. "The 'plain view' doctrine is one such exception." *Baldwin*, 621 F.2d at 253. "A seizure is valid under the plain view doctrine if (1) the officer is lawfully present, (2) the item is in plain view, and (3) the item is clearly incriminating." *State v. Shepard*, 955 P.2d 352, 357 (Utah Ct.App.1998).

¶ 23 If he or she is invited onto private property, a government agent "does not need probable cause nor warrant to enter so long as he does not exceed the scope of his invitation." *Scherer*, 673 F.2d at 182. " 'Once inside the house, [an agent may not] exceed the scope of his invitation by ransacking the house generally, but he may seize anything in plain view.' " *United States v. Wright*, 641 F.2d 602, 604 (8th Cir.) (quoting *United States v. Glassel*, 488 F.2d 143, 145 (9th Cir.1973)), *cert. denied*, 451 U.S. 1021, 101 S.Ct. 3014, 69 L.Ed.2d 394 (1981). *Accord State v. Harris*, 671 P.2d 175, 179 (Utah 1983) ("It is well established law that a government official does not engage in a search within the meaning of the Fourth Amendment if he observes incriminating evidence from a place where he has a right to be."); *Lyons*, 706 F.2d at 329; *Catania*, 398 N.W.2d at 350.

¶ 24 Under the foregoing rules, Rolfe's seizure of the knife and ashtray did not violate the Fourth Amendment, even assuming she was acting as Delahunty's agent. The record indicates that Rolfe, in the process of seeing the knife and ashtray, did not exceed the scope of the invitation given her

---

4. Defendant reminds us that the Fourth Amendment "preclude[s] law enforcement officers or agencies from having informants do for them what they cannot legally do themselves." *Watts*, 750 P.2d at 1221. He vigorously argues Delahunty had Rolfe conduct a search and seizure he could not constitutionally have conducted himself. Defendant points out that Rolfe could not have consented to a search by Delahunty because

she did not have common authority over the home. Defendant's argument is wide of the mark. The Fourth Amendment permits Delahunty to have Rolfe do whatever he could do *if he were her*, i.e., if he had the run of defendant's house. Further, on the facts before us, common authority to consent to a search was not necessary; permissive access was sufficient.

by defendant. The ashtray was in plain view sitting on a shelf in the living room, and Rolfe was lawfully in defendant's living room. The ashtray was clearly incriminating because Rolfe knew it was among the items defendant and Newman had stolen in the burglary. Under the plain view doctrine, Rolfe acted lawfully in seizing the stolen ashtray.

¶ 25 Similarly, the knife was retrieved from defendant's bedroom, where Rolfe also had permission to be. Over a ten-year period, Rolfe was a frequent overnight guest in defendant's home. Defendant's mother testified that Rolfe had been living with defendant, in his bedroom, until a month or two before his arrest. By the time she entered the home and retrieved the knife and ashtray, she had begun a gradual moving out and a cooling-off of her relationship with defendant. Yet, she had never been asked to leave, and some of her personal items remained in the home. The scope of Rolfe's invitation plainly extended to the bedroom she had recently shared with defendant and in which some of her own belongings remained. The record contains nothing to suggest that Rolfe searched a forbidden drawer, pried open a locked closet, or broke into a secured safe in her effort to find the knife. In other words, Rolfe was rightfully in defendant's bedroom, and the record contains no hint that, once there, she exceeded the scope of her permission by intruding into some space inside the bedroom that defendant had kept private from her. *Cf. Lyons,* 706 F.2d at 329 (holding that defendant who unwittingly invited undercover agents into hotel room did not thereby relinquish expectation that closet would remain private).

¶ 26 The trial court correctly determined that Rolfe's seizure of the ashtray and knife did not violate defendant's Fourth Amendment rights. Rolfe had permission to be in defendant's home when she retrieved the stolen items, and in moving about the house, she did not exceed the scope of that permission. The items she seized were in plain view and clearly incriminating. The court properly denied defendant's motion to suppress.

## SUFFICIENCY OF THE AFFIDAVIT TO ESTABLISH PROBABLE CAUSE

¶ 27 Defendant next argues the affidavit prepared by Delahunty and presented to the magistrate to secure the search warrant failed to establish probable cause. Our determination that the ashtray and knife were legally obtained disposes of defendant's contention that the affidavit improperly relied on illegally obtained evidence. We must still determine, however, whether the affidavit was insufficient because Delahunty intentionally, knowingly, or recklessly omitted from the affidavit material facts bearing on Rolfe's credibility as an informant. *See State v. Lee,* 863 P.2d 49, 55 (Utah Ct.App.1993).

¶ 28 Specifically, defendant argues Delahunty, in seeking the search warrant, should have informed the magistrate that Rolfe had been arrested for forging checks stolen in the burglary. Defendant argues this information was material because forgery is a crime of dishonesty bearing directly upon Rolfe's credibility, *see State v. Tucker,* 800 P.2d 819, 822 (Utah Ct.App.1990), and Rolfe's possession of property stolen in the burglary rendered her a possible codefendant whose reliability was inherently suspect. *See Bruton v. United States,* 391 U.S. 123, 135–36, 88 S.Ct. 1620, 1627–28, 20 L.Ed.2d 476 (1968). Without these facts, defendant argues, the affidavit gave the magistrate the false impression that Rolfe was a citizen informant, cooperating solely out of a sense of civic duty, placing her high on the reliability scale. *See State v. Purser,* 828 P.2d 515, 517 (Utah Ct.App. 1992). Consequently, defendant argues the trial court erred when it concluded that "[t]here were no material omissions made which would render the search warrant invalid" and "the search warrant was supported by probable cause."

¶ 29 The Fourth Amendment guaranty against unreasonable searches and seizures "interpos[es] ... a magistrate between the investigating officer and the person who is the object of the search," and requires the magistrate, before issuing a search warrant, to review the affidavit submitted to determine whether it establishes probable cause. *State v. Nielsen,* 727 P.2d 188, 190 (Utah 1986), *cert. denied,* 480 U.S.

930, 107 S.Ct. 1565, 94 L.Ed.2d 758 (1987). "The magistrate's task is to decide 'whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *Purser,* 828 P.2d at 517 (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Of course, a magistrate may err in issuing a search warrant if the information presented in the underlying affidavit is inaccurate or incomplete. *See Nielsen,* 727 P.2d at 190.

¶ 30 When a defendant claims that probable cause to search was premised on a misleadingly incomplete affidavit, we consider the affidavit, together with the omitted information, and determine whether, under the totality of the circumstances, the affidavit would support a finding of probable cause if the omitted information had been included. *See id.* at 191; *State v. Anderson,* 701 P.2d 1099, 1101 (Utah 1985). If the supplemented affidavit would not support probable cause, "any evidence obtained under the improperly issued warrant must be suppressed." *Nielsen,* 727 P.2d at 191.

¶ 31 When probable cause to search is predicated upon facts supplied by an informant, the "informant's veracity, reliability, and basis of knowledge" must be evaluated. *Purser,* 828 P.2d at 517. An informant's credibility is heightened when she provides detailed information based on personal observation, and when her statements are confirmed by police. *See id.; Kaysville City v. Mulcahy,* 943 P.2d 231, 236 (Utah Ct.App.), *cert. denied,* 953 P.2d 449 (Utah 1997). By the same token, a police informant "who gains information through criminal activity or who is 'motivated ... by pecuniary gain[,]' ... is lower on the reliability scale than a citizen-informant." *Mulcahy,* 943 P.2d at 235 n. 2 (citations omitted).

¶ 32 Particularly given the accuracy and detail of the information Rolfe supplied,

we conclude probable cause to search defendant's home would not have been substantially diminished by including the omitted information concerning her credibility. Therefore, even when the omitted information is added, the affidavit still establishes probable cause. The information Rolfe gave was based on her personal knowledge and observation. She was aware in advance that defendant and Newman were planning a burglary. Soon after the burglary, she observed the stolen property as defendant and Newman unloaded it from defendant's car into Newman's home. Later, she described in detail the unique items of stolen property to Delahunty. Further, Rolfe had driven with Newman to the burglarized home the day after the crime, and later directed Delahunty to the premises. Finally, Rolfe observed certain items of stolen property in defendant's home and knew that he kept particular stolen items on his person. She rather conclusively substantiated her statements when she retrieved two of the stolen items from defendant's home with ease.

¶ 33 Further, Delahunty confirmed much of what Rolfe had told him. He testified that Rolfe's information "keyed and dovetailed into everything [he] knew and understood about the burglary." Rolfe's descriptions of the stolen property, as well as the items she removed from defendant's home, matched descriptions given by the victim, and Rolfe correctly identified the burglarized premises. Although Rolfe's possession and forgery of checks stolen in the burglary would normally cast some doubt on her veracity, her positive identification—and even production—of unique items reported stolen by the victim of the burglary is so persuasive, it could not fail to support probable cause even if Rolfe were a known liar. *See People v. Greathouse,* 173 Colo. 103, 476 P.2d 259, 261 (1970). Accordingly, the trial court correctly concluded that the affidavit established probable cause.[5]

## CONCLUSION

¶ 34 The trial court properly denied defendant's motion to suppress evidence. Even if

---

5. Because we conclude the search warrant was properly issued, we need not address defendant's argument that his incriminating post-arrest statements should be suppressed as the fruit of a prior illegality.

Rolfe was acting as a police agent, she entered defendant's home with his permission and did not exceed the scope of his broad invitation in the course of retrieving the knife and ashtray. Further, even if the information concerning Rolfe's credibility were added to the affidavit, the affidavit still establishes probable cause.

¶ 35 Affirmed.

¶ 36 WE CONCUR: JAMES Z. DAVIS, Judge, and MICHAEL J. WILKINS, Judge.

