2001 UT App 401

STATE of Utah, Plaintiff and Appellee,

v.

James DELUNA, Defendant
and Appellant.

No. 20000787–CA.

Court of Appeals of Utah.

Dec. 20, 2001.

Linda M. Jones and Otis Sterling, III, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Marian Decker, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before GREENWOOD, P.J., and JACKSON, Associate P.J., and BENCH, J.

## OPINION

BENCH, Judge:

¶1 Defendant James Deluna challenges both the trial court's determination that probable cause supported the issuance of a search warrant and the admission of evidence obtained in connection with that warrant. We affirm.

## BACKGROUND

¶2 In late January of 1999, a concerned family member (CFM) contacted South Salt Lake Police Officer Scott Daniels with information about a clandestine methamphetamine laboratory located in an apartment

where CFM's niece (Niece # 1), Niece # 1's four-year-old daughter, and Deluna lived. Family members told CFM that Deluna manufactured methamphetamine in the apartment while Niece # 1 and her daughter were present. CFM and a second niece (Niece # 2) went to the apartment and spoke with Niece # 1. Officer Daniels testified that CFM came to the police within thirty-six hours of visiting the apartment because he was concerned for the well-being of Niece # 1 and her daughter. CFM gave Officer Daniels his full name and address but did not want his name used because he feared retaliation by Deluna. CFM reported the following information, which Officer Daniels included in his affidavit in support of a search warrant:

> The CFM is a former police officer and has knowledge of methamphetamine manufacturing and related paraphernalia....
>
> When the CFM went to [the apartment], Deluna was not home. [Niece # 1] told [CFM] that Deluna was out delivering methamphetamine. She stated [that Deluna] had finished cooking and had disassembled the lab. [Niece # 1] was very hesitant to say very much because she believed Deluna would kill her family. She did tell [CFM] that Deluna cooks methamphetamine at the apartment when she and her child are there. She also stated [Deluna] has two handguns he keeps with him.
>
> The CFM was also accompanied to the apartment by another niece [Niece # 2]. Niece # 2 has been inside the apartment when Deluna has been cooking methamphetamine. [Niece # 2] went to a bedroom where Deluna sleeps and found parts of the meth lab in a closet. She showed it to the CFM who described it to your affiant [Officer Daniels]. [CFM] stated he saw a heating mantle with a glass beaker sitting on it. He also saw several other glass beakers with white residue on them. There was a locked footlocker on the floor in the closet. [CFM] told me [Officer Daniels] he didn't look any further because [Deluna] could have come back home.

Officer Daniels did not verify that CFM was a former police officer with methamphetamine experience and did not contact Niece # 1 to verify the statements and observations she allegedly related to CFM and Niece # 2.

¶ 3 Officer Daniels did, however, contact Niece # 2. Officer Daniels called a telephone number provided by CFM and spoke with a woman who identified herself as Niece # 2. Officer Daniels testified that Niece # 2 was reluctant to speak with him because she feared Deluna. Officer Daniels further testified that Niece # 2 expressed concern for the safety of Niece # 1 and her daughter. Like CFM, Niece # 2 gave her full name, but requested that it not be used because she feared retaliation. She then provided Officer Daniels with the following additional information, which he included in his affidavit:

> [Niece # 2] stated that she knew where the lab was because she [had] witnessed [Deluna] put the lab into the footlocker in the closet. She stated that the items that they saw sitting in the closet [have] been used as part of [a] clandestine lab. There [have] been several occasions where she has witnessed [Deluna] manufacturing methamphetamine at the apartment within the past two weeks. Niece # 2 is afraid [Deluna] will kill Niece # 1 if she leaves.

After speaking with the informants, Officer Daniels conducted a criminal history check on Deluna, which revealed that he had been convicted of "two counts of Possession of a Controlled Substance With The Intent to Distribute and Aggravated Assault." Officer Daniels included this information in his affidavit.

¶ 4 Officer Daniels prepared his affidavit with assistance from both a detective with specialized experience in drug enforcement and an assistant attorney general. After reviewing the affidavit, Judge Stephen Henriod issued a search warrant for the apartment, as well as Deluna's person and vehicle.

¶ 5 Three days later, on February 5, 1999, police officers executed the warrant. Deluna was not home at the time, but a woman at the apartment indicated that he would be right back. The officers immediately began searching the apartment and seized the following items from a downstairs bedroom: methamphetamine, chemicals and other items and tools used to manufacture methamphetamine, four marijuana plants, a load-

ed handgun, and some personal items bearing Deluna's name.

¶ 6 While the search was in progress, Deluna returned to the apartment. After being arrested, Deluna admitted to the officers that he lived in the apartment and slept in the bedroom where police officers found the evidence. He also indicated that his girlfriend, Niece # 1, had been living in the apartment but had recently moved out. Deluna then admitted that a friend, whom he refused to name, gave Deluna the marijuana plants a couple of days earlier. Deluna also confessed that the loaded handgun belonged to him. Regarding the lab equipment and chemicals, Deluna stated that they belonged to a friend, whom he would not name. Deluna expressed surprise that the lab was found in the apartment. He stated that the lab "comes and goes," but he was unaware of anyone using it during the last month. Deluna then admitted that he provided "a place for people to manufacture methamphetamine as well as storage of the lab." He also admitted that he received methamphetamine in exchange for cleaning up the lab after its use. Finally, he admitted using methamphetamine two or three days earlier. The officers searched both Deluna and his vehicle, but found no additional evidence.

¶ 7 Before trial, Deluna filed a motion to suppress his confession on the basis that the police officers did not give him a *Miranda* warning prior to the confession. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Deluna also moved to suppress the evidence seized during the search of the apartment because Officer Daniels's affidavit failed to establish probable cause for a search warrant. After an evidentiary hearing and oral arguments, the trial court denied Deluna's motion in a bench ruling. While indicating that Daniels could have provided more information in the affidavit, the trial court nevertheless ruled that, under the totality of the circumstances, the affidavit established probable cause for the issuance of a search warrant. The trial court further found that Deluna had, in fact, been given a *Miranda* warning prior to his confession.

¶ 8 A jury convicted Deluna for 1) Operation of a Clandestine Laboratory, a first degree felony, in violation of Utah Code Ann. §§ 58–37d–4, –5 (1998); 2) Illegal Possession or Use of a Controlled Substance, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a)(i) (1998); and 3) Possession of a Controlled Substance with Intent to Manufacture or Produce, a third degree felony, in violation of Utah Code Ann. § 58–37–8(1)(a)(i) (1998). Deluna now appeals.

## ISSUE AND STANDARD OF REVIEW

¶ 9 Deluna does not appeal the trial court's finding that the police officers gave Deluna a *Miranda* warning prior to his confession. We therefore consider only whether the trial court erred in upholding Judge Henriod's determination that Officer Daniels's affidavit established probable cause for the issuance of a search warrant for the apartment.

> Because this court, like the reviewing court below, is bound by the contents of the affidavit, we therefore need not defer to the trial court's finding, but rather, we make an independent review of the trial court's determination of the sufficiency of the written evidence.

*State v. Weaver,* 817 P.2d 830, 833 (Utah Ct.App.1991). However, "the [F]ourth [A]mendment does not require that the reviewing court conduct a de novo review of the magistrate's probable cause determination[.] [I]nstead, it requires only that the reviewing court conclude 'that the magistrate had a substantial basis for ... [determining] that probable cause existed.'" *State v. Babbell,* 770 P.2d 987, 991 (Utah 1989) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)) (fifth and sixth alterations in original).

¶ 10 Furthermore, "the reviewing court is required to give great deference to the magistrate's determination." *State v. White,* 851 P.2d 1195, 1198 (Utah Ct.App. 1993). Great deference is given because " '[a] grudging or negative attitude by reviewing courts toward warrants' is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant

to a warrant." *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331 (citation omitted).

## ANALYSIS

¶ 11 "The Fourth Amendment guaranty against unreasonable searches and seizures interpos[es] ... a magistrate between the investigating officer and the person who is the object of the search, and requires the magistrate, before issuing a search warrant, to review the affidavit submitted to determine whether it establishes probable cause." *State v. McArthur*, 2000 UT App 23, ¶ 29, 996 P.2d 555 (quotations and citations omitted) (alterations in original).

The magistrate's task is to decide whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* (quotations and citations omitted). Where, as here, information obtained from informants is the primary support for the search warrant, an analysis of the totality of the circumstances requires us to consider the three factors articulated by this court in *Kaysville City v. Mulcahy*, 943 P.2d 231, 235–36 (Utah Ct.App.1997). *See State v. Valenzuela*, 2001 UT App 332, ¶¶ 16–17, 434 Utah Adv. Rep. 14 (extending application of *Mulcahy* factors to probable cause determinations). We now consider those three factors, in order.

### I. Type of Informant

¶ 12 The first factor is "the type of tip or informant involved." *Mulcahy*, 943 P.2d at 235. The primary support for the search warrant was information provided by CFM and Niece # 2. CFM reported that he visited the apartment within the past thirty-six hours. While there, Niece # 2 showed him "a heating mantle with a glass beaker sitting on it. He also saw several other glass beakers with white residue on them." He further saw a locked footlocker. Niece # 2 corroborated CFM's report and provided more detail by stating that "she knew where the lab was because she [had] witnessed [Deluna] put the lab into the footlocker in the closet. She stated that the items that [she showed CFM had] been used as part of [a] clandestine lab." Further, Niece # 2 indicated that she had witnessed Deluna manufacture methamphetamine at the apartment several times during the past two weeks.

¶ 13 Deluna contends that the affidavit is insufficient because it "does not contain specific facts regarding the veracity, reliability and basis of knowledge" of CFM or Niece # 2. The information outlined above came from the two informants' personal observations, which satisfies the basis-of-knowledge component of the totality-of-the-circumstances test. *See State v. Purser*, 828 P.2d 515, 517 (Utah Ct.App.1992). Deluna argues that the informants did not have an independent basis of knowledge that the items observed belonged to Deluna or that he was personally involved in the production of methamphetamine. While we agree that CFM's personal observations were inadequate to pinpoint Deluna as a suspect, personal knowledge of such facts was not necessary to support a search warrant for the apartment. "[A] probable cause determination centers on the probability that evidence of a crime will be found in a *particular place* ...." *State v. Brooks*, 849 P.2d 640, 644 (Utah Ct.App.1993) (emphasis added) (citing *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332). Regardless of who was involved, CFM had personal knowledge that evidence of methamphetamine production would be found in the apartment. Furthermore, Niece # 2 personally observed Deluna using the lab equipment to produce methamphetamine, which established Deluna as a suspect. Thus, Deluna's basis-of-knowledge argument is without merit.

¶ 14 With respect to the informants' veracity and reliability, this court has previously held that an "ordinary citizen-informant needs no 'independent proof of reliability or veracity.'" *Mulcahy*, 943 P.2d at 235 (quoting *State v. Brown*, 798 P.2d 284, 286 (Utah Ct.App.1990)). "We simply assume veracity when a citizen-informant provides information as a victim or witness of crime." *Id.* Deluna counters that the presumption of veracity and reliability should not apply in

this case because CFM and Niece #2 are not disinterested citizens, but rather had a specific interest in diverting attention from Niece #1. The record does not support Deluna's contention. Niece #1 had recently resided at the apartment with Deluna and was found there when CFM and Niece #2 visited just days prior to the execution of the search warrant. By drawing police attention to the apartment, the informants risked that Niece #1 might be implicated in criminal conduct. Despite this risk, Officer Daniels testified that he offered the informants nothing in exchange for their information. Furthermore, Deluna does not cite to any evidence showing that either CFM or Niece #2 sought favorable treatment for Niece#1 or any other concession. *See Purser,* 828 P.2d at 517 ("[R]eliability and veracity are generally assumed when the informant is a citizen who receives nothing from the police in exchange for the information.").

¶ 15 The citizen-informant presumption is warranted in this case for three additional reasons. First, CFM and Niece #2 gave their full names to Officer Daniels. By doing so, they subjected themselves to a penalty for providing false information. *See St. George City v. Carter,* 945 P.2d 165, 169 (Utah Ct.App.1997). Second, the record indicates that both CFM and Niece #2 were fearful of retaliation. This "concern provide[d] the informant[s] with a strong motive not to lie." *United States v. Fairchild,* 774 F.Supp. 1544, 1552 (W.D.Wis.1990) (rejecting defendant's challenge to the informant's veracity). Third, Officer Daniels's testimony indicates that CFM and Niece #2 came forward not for personal benefit, but out of concern for the well-being of Niece #1 and her daughter. *See Mulcahy,* 943 P.2d at 235 (stating presumption applies to citizen-informants because they are not motivated by personal benefit); *State v. White,* 851 P.2d 1195, 1199 (Utah Ct.App.1993) (determining that citizen-informant presumption applies when informant gives information out of concern for a close relative).

■■■ ¶ 16 Deluna puts forth the following additional reasons why the citizen-informant presumption should not apply to Niece #2: 1) she declined to initiate contact with Officer Daniels or to meet with him in person, and 2) she did not explain her presence in the apartment when she saw Deluna producing methamphetamine. We have previously applied the citizen-informant presumption to informants whose only contact with the police was by the telephone. *See Mulcahy,* 943 P.2d at 233 (reasonable suspicion context); *Carter,* 945 P.2d at 167 (same). While it is true that, unlike this case, the informants in *Mulcahy* and *Carter* initiated contact with the police, we see no meaningful difference between an informant who initiates contact and an informant who freely gives information after being contacted by the police. If anything, officer-initiated calls might be considered more reliable because the officer has a phone number that can be used to track the informant. Thus, for purposes of applying the citizen-informant presumption, our focus is not on who initiates the contact, but on whether the informant seeks or is promised anything in exchange for cooperating. *Cf. State v. McCloskey,* 453 N.W.2d 700, 703 (Minn.1990) ("Significantly, the informant was not like the typical 'stool pigeon' who is arrested and who, at the suggestion of the police, agrees to cooperate and name names in order to curry favor with the police."). In this case, Deluna does not cite to any evidence showing that Niece #2 asked for or was promised anything in exchange for her cooperation. Thus, Deluna's first argument regarding Niece #2 is without merit.

■ ¶ 17 Turning to Deluna's second argument, we have previously applied the citizen-informant presumption to an informant who did not explain her presence during the commission of a crime. *See White,* 851 P.2d at 1199. The informant in *White* reported that she had accompanied her husband to the target house, waited outside while he went in to purchase cocaine, and was with him when he returned outside to ingest the cocaine. *See id.* at 1196; *see also State v. Blaha,* 851 P.2d 1205, 1209 (Utah Ct.App.1993) (upholding the veracity of an informant who reported identical information as the informant in *White*). Although the informants in *White* and *Blaha* accompanied their spouses during the commission of a crime, we did not require

them to explain their presence. Likewise, Niece #2 reported only that she had been present while methamphetamine was produced, and not that she "gain[ed] information through *involvement* in criminal activity." *Mulcahy*, 943 P.2d at 235 n. 2 (emphasis added). We therefore uphold Niece #2's status as a citizen-informant, who is presumed reliable.

¶18 In sum, we conclude that CFM and Niece #2 are both entitled to the citizen-informant presumption. Thus, the affidavit was not required to set forth specific facts to establish their veracity and reliability. *See Mulcahy*, 943 P.2d at 235; *Purser*, 828 P.2d at 517.

## II. Information Detail

¶19 The second *Mulcahy* factor we must consider is whether "the informant gave enough detail about the observed criminal activity to support a [warrant]." 943 P.2d at 236. When considered alone, CFM's observations may not have established probable cause to support the search warrant. However, his observations were corroborated and placed in a criminal-activity context by Niece #2. *See State v. Singleton*, 854 P.2d 1017, 1020 (Utah Ct.App.1993) (stating that probable cause may be established by information given by multiple informants, "even if an individual informant's information would not establish probable cause if considered separately"). Niece #2's corroboration is particularly significant because she personally observed Deluna using the lab equipment viewed by CFM to produce methamphetamine. *See Mulcahy*, 943 P.2d at 236 ("A tip is more reliable if it is apparent that the informant observed the details personally, instead of simply relaying information from a third party."); *see also Valenzuela*, 2001 UT App 332 at ¶28, 37 P.3d 260; *Purser*, 828 P.2d at 517. When considered together, the information provided by CFM and Niece #2 was sufficiently detailed to establish probable cause that methamphetamine was being produced in the apartment.

## III. Confirmation by Police Officer

¶20 The final *Mulcahy* factor is whether the police officer independently con-

firms the informants' information. *See* 943 P.2d at 236. Here, Officer Daniels's affidavit indicates that the only independent investigation he conducted was a search of Deluna's criminal record. Ideally, Officer Daniels should have contacted Niece #1 or otherwise corroborated the informants' information; however, the failure to do so is not fatal in this case. *See State v. Markus*, 478 N.W.2d 405, 408 (Iowa Ct.App.1991) (cited in *Mulcahy*, 943 P.2d at 236, for the proposition that corroboration of the inculpatory details of a tip is not mandatory). We stated in *Mulcahy* that a police officer " 'may corroborate the tip either by observing the illegal activity or by finding [the material facts] substantially as described by the informant.' " *Id.* (citation omitted). The tips in this case concerned production of methamphetamine inside the apartment. Officer Daniels could not observe the alleged illegal activity without entering the apartment. Likewise, he would have to enter the apartment to independently confirm that the material facts were as described by CFM and Niece #2. While contacting Niece #1 would have provided some corroborating information, Officer Daniels already corroborated CFM's information by contacting Niece #2. Any additional confirmation from Niece #1 would have been yet more hearsay information, and not the kind of independently obtained police information contemplated by the third *Mulcahy* factor.

¶21 Furthermore, we also stated in *Mulcahy* that " '[w]here the reliability of the information is increased, less corroboration is necessary.' " *Id.* (citation omitted) (alteration in original). The tips here were very reliable because they involved personal observations of methamphetamine production and paraphernalia by citizen informants who, in addition to being presumptively reliable, risked implicating a family member in criminal activity. Because both the opportunity for independent corroboration was limited and the informants' tips were reliable, Officer Daniels's lack of independent investigation does not outweigh the other two factors in our analysis. *See Gates*, 462 U.S. at 241, 103 S.Ct. at 2333 ("As previously noted, probable cause deals 'with probabilities. These are

not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " (Citation omitted.)). Our combined analysis of the three *Mulcahy* factors leads us to conclude that the personal observations of CFM and Niece # 2 alone were sufficient to establish a fair probability that evidence of methamphetamine production would be found in the apartment.[1] Therefore, probable cause existed to support the issuance of the search warrant.

## CONCLUSION

¶ 22 Under the totality of the circumstances, the personal observations of CFM and Niece # 2 established probable cause that evidence of methamphetamine production would be found at the apartment. Therefore, the search warrant was valid, and the evidence obtained in connection with the execution of that warrant, including Deluna's confession, was properly admitted at trial.

¶ 23 Accordingly, we affirm Deluna's convictions.

¶ 24 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge and NORMAN H. JACKSON, Associate Presiding Judge.

---

1. Because we conclude that the personal observations of CFM and Niece # 2 established probable cause for the issuance of a search warrant, we need not discuss the information included in the affidavit concerning Deluna's criminal record or the hearsay statements allegedly made by Niece # 1 and other family members to CFM and Niece # 2.