2010 UT 34

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Jose Baltarcar ROYBAL, Defendant and Respondent.**

No. 20080776.

Supreme Court of Utah.

May 14, 2010.

Mark L. Shurtleff, Att'y Gen., Ryan D. Tenney, Asst. Att'y Gen., Salt Lake City, for petitioner.

Randall W. Richards, Ogden, for respondent.

Stewart P. Ralphs, Salt Lake City, for Amicus.

WILKINS, Justice:

## INTRODUCTION

¶ 1 Defendant Jose Baltarcar Roybal was convicted of one count of driving under the influence of alcohol. Before trial, he moved to suppress the admission of the evidence obtained from a traffic stop, arguing that the traffic stop constituted an unreasonable search and seizure in violation of his rights under the Fourth Amendment to the United States Constitution, as well as article I, section 14 of the Utah Constitution. The district court denied his motion to suppress, but the court of appeals reversed. We granted certiorari on one issue—whether the majority of the panel of the court of appeals erred in reversing the district court's determination that there was a reasonable, articulable suspicion to stop Roybal. We reverse.

## BACKGROUND

██ ¶ 2 " 'The legal analysis of search and seizure cases is highly fact dependent.' " *State v. Alverez,* 2006 UT 61, ¶ 2, 147 P.3d

425 (quoting *State v. Brake*, 2004 UT 95, ¶ 2, 103 P.3d 699). "Therefore, we give a detailed recitation of the facts." *Id.*

¶ 3 On August 8, 2005, a police dispatcher received a 911 call from Jose Baltarcar Roybal's live-in girlfriend, Annalee McCaine, requesting police assistance in a dispute between the two. McCaine was upset and stated that she wanted the person living with her out of the house. The dispatcher asked her whether she had been assaulted, to which McCaine responded, "Just about, yes." Later, however, the dispatcher clarified, "And he hasn't assaulted you?" to which McCaine replied, "No." When the dispatcher asked if Roybal had been drinking, McCaine replied, "We both have. And you might have to take both of [us]." She said that she did not care, she "just want[ed] him out." After the dispatcher told McCaine to "take a couple of deep breaths," McCaine identified Roybal as her roommate and gave the dispatcher Roybal's first and last names, age, and ethnicity. Earlier, McCaine gave the dispatcher her own first and last names, her phone number, and her address. McCaine also reported that Roybal was "out putting stuff in his van" and was "leaving," and gave a description of the van and a partial license plate number. After Roybal pulled out of the driveway, McCaine told the dispatcher which road Roybal was on and the direction that he was heading. The district court later observed, after listening to a recording of the call, that McCaine sounded intoxicated.

¶ 4 Based on the call, the 911 dispatcher sent out a bulletin requesting police officer assistance. Sergeant Chad Ledford responded. The dispatcher informed Ledford that a "[m]ale and a female [were] verbally fighting, no weapons, both parties are very intoxicated." The dispatcher also identified Roybal, gave the make and color of his vehicle and his direction of travel, and stated that he was "1055," police code meaning that a driver may be intoxicated.

¶ 5 While traveling eastbound on 30th Street toward McCaine's residence, Sergeant Ledford saw Roybal's van approaching on an adjoining street, Brinker Avenue. Although there was no oncoming traffic, Roybal sat at the stop sign for a few seconds before turning right onto 30th. Sergeant Ledford testified that as Roybal turned the corner and approached Sergeant Ledford, he drove "really, really slow." The speed limit on 30th was 35 miles per hour (mph), but Sergeant Ledford estimated that Roybal was driving between 5 and 25 mph. Sergeant Ledford was stopped at the stop light at the intersection of 30th and Harrison Boulevard. As he watched Roybal approach him from the rear, it appeared to Sergeant Ledford that Roybal was hoping the red light would change and Sergeant Ledford would go through the intersection before Roybal arrived. However, the light did not change, and Roybal pulled in next to Sergeant Ledford at the light, stopped for a few seconds, then made another right turn onto Harrison Boulevard. Sergeant Ledford followed. Roybal continued to drive below the speed limit and made another right-hand turn onto Patterson Avenue. It appeared to Sergeant Ledford that Roybal was trying to avoid him.

¶ 6 Based on his observations, Sergeant Ledford suspected that Roybal was drunk. Sergeant Ledford testified that through his training and experience, he has come to recognize slow driving as a sign of intoxication because when someone has been drinking, their fine motor skills and thinking are impaired, causing them to drive more slowly. Sergeant Ledford asserted that in an effort to avoid police, impaired drivers will also slow down and stay behind police vehicles. Sergeant Ledford testified that Roybal had engaged in these exact behaviors. He also acknowledged that Roybal had not violated any traffic laws.

¶ 7 Sergeant Ledford also testified that he suspected Roybal of committing domestic violence. He knew from the 911 dispatch bulletin that there had been a domestic dispute that had prompted a 911 call. Department policy thus required him to interview both the victim and the suspect. In addition, Sergeant Ledford testified that suspects will often leave the house initially but circle back and return to the scene if the police do not arrive. Because Roybal was driving a slow, circuitous route in the vicinity of McCaine's house, Sergeant Ledford's concern increased.

¶ 8 Sergeant Ledford pulled Roybal over approximately twelve blocks from McCaine's home. Because he could smell alcohol as he approached the car, and because Roybal failed a number of field-sobriety tests, Sergeant Ledford arrested Roybal for driving under the influence of alcohol (DUI).

¶ 9 The State subsequently charged Roybal with one count of driving under the influence of alcohol, a third degree felony, in violation of Utah Code section 41–6a–502 (2005).[1] Roybal moved to suppress all evidence obtained as a result of his traffic stop, arguing that the stop was unsupported by a reasonable suspicion that he had committed a crime. However, the district court denied Roybal's motion to suppress, concluding that the stop was justified by the 911 dispatcher's reasonable suspicion that Roybal was driving under the influence of alcohol. The court did not specifically address whether Sergeant Ledford had an independent reasonable suspicion that Roybal was driving while intoxicated based on his own observations or a reasonable suspicion that Roybal had committed domestic violence. Following the court's ruling, Roybal entered a conditional guilty plea to one count of driving under the influence, a third degree felony, preserving his right to appeal. Roybal thereafter timely appealed to the court of appeals following sentencing.

¶ 10 A divided panel of the court of appeals reversed. *State v. Roybal*, 2008 UT App 286, ¶ 1, 191 P.3d 822. The court concluded that the stop was not justified by reasonable suspicion for four reasons. First, because of McCaine's personal relationship with Roybal and the lack of detail provided in her call, the court considered the information relayed in her 911 call less reliable. *Id.* ¶¶ 11–13. Second, the court found that the 911 dispatcher lacked reasonable suspicion that Roybal was driving while intoxicated because there was no information regarding "the quantity or type of alcohol he consumed[,] how long he had been drinking," or Roybal's weight. *Id.* ¶¶ 14–15. Third, the court concluded that Sergeant Ledford's own observations were insufficient to support a reasonable suspicion because where Roybal had not actually violated any traffic laws, his conduct was not "suggestive of criminality." *Id.* ¶ 16. Finally, the court noted that Sergeant Ledford lacked a reasonable suspicion of domestic violence because the call indicated merely a "nonphysical confrontation" insufficient to justify a stop. *Id.* ¶ 17 n. 6.

¶ 11 Judge Thorne dissented, concluding that based on the call, the 911 dispatcher did have a reasonable suspicion of DUI. Judge Thorne reasoned that McCaine's relationship to Roybal was insufficient to render her call unreliable, and that the details she provided, coupled with her apparently intoxicated state, were sufficient to create a reasonable suspicion of DUI. *Id.* ¶¶ 19–22 (Thorne, J., dissenting). According to Judge Thorne, Sergeant Ledford was therefore justified in making the stop.

¶ 12 Following issuance of the court of appeals' ruling, the State petitioned for certiorari review, which we granted. The Utah Domestic Violence Council, joined by the Utah Coalition Against Sexual Assault, submitted an amicus brief. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(a) (2008).

## STANDARD OF REVIEW

¶ 13 "On certiorari, we review the decision of the court of appeals and not that of the district court." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425 (internal quotation marks omitted). Our review is for correctness, granting no deference to the court of appeals' application of law to the underlying factual findings. *Id.*

## ANALYSIS

¶ 14 The sole issue before us is whether there was a reasonable, articulable suspicion sufficient to support Roybal's traffic stop. "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehi-

---

1. Roybal was also charged with one count of violating a no alcohol conditional license, a class B misdemeanor, in violation of Utah Code section 53–3–232 (2007). However, the district court later dismissed this charge.

cles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting U.S. Const. amend. IV). "However, it is settled law that 'a police officer may detain and question an individual when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity.'" *State v. Markland*, 2005 UT 26, ¶ 10, 112 P.3d 507 (quoting *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996)). "The specific and articulable facts required to support reasonable suspicion are most frequently based on an investigating officer's own observations and inferences...." *State v. Case*, 884 P.2d 1274, 1276–77 (Utah Ct. App.1994). However, "under certain circumstances the officer may rely on other sources of information" such as "bulletins[ ] or flyers received from other law enforcement sources," so long as "'the police who *issued* the flyer or bulletin possessed a reasonable suspicion justifying a stop.'"[2] *Id.* at 1277 (quoting *United States v. Hensley*, 469 U.S. 221, 233, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)). As the court of appeals correctly noted, the dispatch report in this case qualifies as a "flyer," *State v. Roybal*, 2008 UT App 286, ¶ 9 n. 5, 191 P.3d 822, which term "has been taken to mean any information intended to prompt investigation that is transmitted through police channels, regardless of method." *Id.* at 1277 n. 4.

¶ 15 In stopping Roybal's vehicle, Sergeant Ledford relied primarily on the 911 dispatch report. This was appropriate so long as the 911 dispatcher "'possessed a reasonable suspicion justifying a stop.'" *Id.* at 1277 (quoting *Hensley*, 469 U.S. at 233, 105 S.Ct. 675). However, the court of appeals determined that the 911 call from Roybal's girlfriend was not sufficient to provide the dispatcher with a reasonable, articulable suspicion that Roybal was driving under the influence of alcohol. The court reached this conclusion primarily by considering the call to be of questionable reliability. Relying on *Salt Lake City v. Bench*, 2008 UT App 30, 177 P.3d 655, the court stated, "When a citizen-informant has some kind of personal involvement with the suspect, the information conveyed is considered less reliable because there is a possibility that the citizen is making allegations out of anger, out of jealousy, or for other personal reasons." *State v. Roybal*, 2008 UT App 286, ¶ 11, 191 P.3d 822. This statement is incorrect, and to the extent that *Bench* suggests otherwise, we now clarify.

¶ 16 As stated in *Bench*, "Because a citizen-informant volunteer[s] information out of concern for the community and not for personal benefit, and because the informant is exposed to possible criminal and civil prosecution if the report is false, a tip from an identified citizen-informant is generally considered highly reliable." 2008 UT App 30, ¶ 15, 177 P.3d 655 (alteration in original) (citations and internal quotation marks omitted). *See also State v. Norris*, 2001 UT 104, ¶ 18, 48 P.3d 872 ("[R]eliability and veracity are generally assumed when the informant is a citizen who receives nothing from the police in exchange for the information." (internal quotation marks omitted)); *State v. Keener*, 2008 UT App 288, ¶ 10, 191 P.3d 835 ("[C]itizen informants are high on the reliability scale and are entitled to a presumption of veracity.")....; *State v. Comer*, 2002 UT App 219, ¶ 22, 51 P.3d 55 ("[N]ot all tips are of equal value in establishing reasonable suspicion[,] ... [b]ut an identified citizen informant is high on the reliability scale. The ordinary citizen-informant needs no indepen-

---

**2.** The State argues that the court of appeals applied an impermissible "divide and conquer" analysis in its consideration of the facts. We have said that "courts must look to the totality of the circumstances to determine whether, taken together, the facts warranted further investigation by the police officer." *State v. Alverez*, 2006 UT 61, ¶ 14, 147 P.3d 425 (internal quotation marks omitted). However, when determining whether a 911 dispatch report or other "flyer or bulletin" was sufficient to support a stop, a court may look at the report as an independent basis for a reasonable suspicion. If it is not indepen-

dently sufficient, then the officer's own observations may bolster the factual scenario to reach a reasonable suspicion. In that instance, the dispatch report and the officer's own observations should not be considered in isolation. However, because we determine in this case that the 911 dispatcher had sufficient facts to form a reasonable suspicion, the report alone was sufficient to justify Sergeant Ledford's stop, provided his own observations were not inconsistent. Therefore, we need not address the State's remaining argument that the court of appeals' method of analysis was incorrect.

dent proof of reliability or veracity. We simply assume veracity when a citizen-informant provides information as a victim or witness of crime." (alterations in original) (internal citations and quotation marks omitted)). In contrast, informants are considered less reliable when they are anonymous, *Florida v. J.L.*, 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), or when they receive their information through criminal activity or are motivated by pecuniary gain. *State v. McArthur*, 2000 UT App 23, ¶ 31, 996 P.2d 555.

¶ 17 In *Bench*, despite recognizing the presumption of reliability for an identified citizen-informant, the court of appeals went on to say that "there are circumstances where a citizen-informant's veracity may properly be called into question." 2008 UT App 30, ¶ 15, 177 P.3d 655. To illustrate, the court cited several cases where personal involvement between the informant and the suspect led to a possibility of bias and fabricated allegations. *Id.* Indeed, some courts have treated tips from personally involved family or friends as of questionable reliability. *See, e.g., United States v. Phillips*, 727 F.2d 392, 393–94, 398 (5th Cir.1984) (noting that the informant's recent quarrel with and estrangement from her husband, the defendant, "may have cast doubt on her trustworthiness"); *State v. Morris*, 444 So.2d 1200, 1204 (La.1984) (discussing veracity of informant who, involved in a custody dispute with his wife, may have wanted to give "a false report to embarrass or inconvenience" her); *State v. Lindquist*, 295 Minn. 398, 205 N.W.2d 333, 335 (1973) (stating that a "prior relationship with a suspect might give an informer motive to lie or exaggerate"); *State v. Williams*, 193 S.W.3d 502, 507–08 (Tenn.2006) (declining to presume reliability of tip when informant was defendant's girlfriend, and they had recently quarreled); *State v. White*, 856 P.2d 656, 662 (Utah Ct.App.1993) (recognizing that ex-wife's allegations that defendant was high on cocaine and had been involved in a domestic disturbance earlier in the day were of "questionable reliability").

¶ 18 However, many courts have also considered tips from family or friends to be of greater reliability because a family member or close friend often has a greater opportunity to observe the criminal behavior of the suspect and may have an incentive not to report the suspect due to family loyalty. *See, e.g., Illinois v. McArthur*, 531 U.S. 326, 331–32, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (finding probable cause where wife's tip was based on personal observation of criminal activity); *United States v. Smith*, 457 F.Supp.2d 802, 805 (E.D.Mich.2006) (relying on tip from ex-girlfriend who claimed to have a close personal relationship with defendant); *State v. Cowdin*, 25 Kan.App.2d 176, 959 P.2d 929, 933 (1998) (presuming reliability of tip from spouse living at the same residence); *State v. Van Ruiten*, 107 N.M. 536, 760 P.2d 1302, 1305 (N.M.Ct.App.1988) ("[T]he familial relationship of the [informant] no doubt lent credibility...."); *People v. Butchino*, 152 A.D.2d 854, 544 N.Y.S.2d 64, 65–66 (1989) (upholding wife's affidavit because she "clearly [had] personal knowledge of the facts asserted"); *State v. Nelson*, 691 N.W.2d 218, 227 (N.D.2005) (stating that other courts have presumed reliability when an informant is a spouse living at the residence to be searched); *State v. Boushee*, 284 N.W.2d 423, 430 (N.D.1979) (deeming a wife's affidavit of greater reliability because it inculpated her spouse); *State v. Deluna*, 2001 UT App 401, ¶ 21, 40 P.3d 1136 (granting tip greater reliability because informants relied on personal observation and risked implicating an involved family member). Similarly, several courts have specifically rejected the argument that family or friend informants are presumed less reliable, and instead have openly relied on such tips. *See, e.g., United States v. Hodges*, 705 F.2d 106, 108 (4th Cir.1983) (concluding that even if the informant, a former live-in girlfriend, "harbored ill will toward [the defendant], her credibility [could not] be rejected on [that] ground"); *State v. Olson*, 314 Mont. 402, 66 P.3d 297, 303 (2003) (determining that evidence of strained relationship between informant and defendant, his estranged wife, was insufficient to overcome presumption of reliability); *State v. Amelio*, 197 N.J. 207, 962 A.2d 498, 502 (2008) (relying on tip from daughter despite her recent dispute with the defendant); *State v. Bradley*, 101 Ohio App.3d 752, 656 N.E.2d 721, 722, 724 (1995) (relying on girl-

friend's tip despite earlier altercation with the defendant).

¶ 19 *After reviewing the case law, as well as the arguments in the case before us, we find that the fact of personal involvement between an informant and a suspect can be construed to have conflicting effects. As such, we find it inappropriate to attach a presumption of either greater or lesser reliability to a tip from a personally involved informant. We therefore hold that the fact of personal involvement with the suspect carries no presumption one way or the other; a personally involved informant is not presumed to have any lesser or greater reliability than any other identified informant.*[3] Indeed, an identified citizen-informant is presumed reliable, and personal involvement of the informant with the suspect neither weakens, nor strengthens, that presumption. Instead, after recognizing the initial presumption, as Judge Thorne stated in his dissent below, "Courts should evaluate the specific and articulable facts required to support reasonable suspicion in their totality, rather than looking at each fact in isolation." *Roybal,* 2008 UT App 286, ¶ 19, 191 P.3d 822 (Thorne, J., dissenting) (citing *State v. Worwood,* 2007 UT 47, ¶ 23, 164 P.3d 397); *see also Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (adopting a "totality-of-the-circumstances" approach to determining informant reliability in place of a rigid, separate-elements test).

¶ 20 Looking to the totality of the circumstances in the instant case, we believe the 911 call was sufficient to provide the dispatcher with reasonable suspicion that Roybal was driving under the influence. Irrespective of the fact that McCaine was Roybal's live-in girlfriend, she was an identified citizen-informant who is presumptively reliable. Her personal involvement with Roybal, on its face, neither weakens, nor strengthens, that presumption; we must consider the unique facts of this case. She gave her full name and address, thereby fully exposing herself to liability for fraudulent allegations. Further, she did not call with the intention of reporting Roybal's drunk driving but to request help removing him from her home. Her statement that Roybal had been drinking was made off-handedly and with the acknowledgment that she, too, had been drinking, which indicates that her remark was simply a statement of fact and lacked an ulterior motive. In addition, she provided specific details of her first-hand observations. McCaine reported to the dispatcher that she had been with Roybal, that they had been drinking together, and that he had just left. She also described his vehicle with partial license plate number, the area he was in, and the direction he was heading. Coupled with the fact that McCaine was noticeably intoxicated on the phone, the dispatcher could make the reasonable inference that Roybal was similarly intoxicated, and was driving. Unlike the court of appeals, we do not believe that it was necessary for McCaine to report how much or how long Roybal had been drinking, the type of drink consumed, or his weight. Undoubtedly these details would have strengthened the report. However, because McCaine said Roybal had been drinking with her, and she was clearly intoxicated, it was reasonable for the dispatcher to infer that Roybal was likewise intoxicated. Thus, the details provided in the call, together with their reasonable inferences, given from a reliable, identified citizen-informant, were sufficient for the dispatcher to form a reasonable suspicion that Roybal was driving while intoxicated.[4]

3. The State also argues that we should consider McCaine's call presumptively reliable because it was a 911 emergency call. This issue has not yet been addressed in Utah, and we need not decide it in this case.

4. In addition, the State contends that Sergeant Ledford was justified in making the stop based on the dispatcher's reasonable suspicion that Roybal had committed domestic violence. Having determined that the dispatcher possessed a reasonable suspicion that Roybal was driving under the influence of alcohol, we need not make that additional determination. However, we note that to the degree that footnote six of the court of appeals' opinion suggests that only a physical confrontation would justify a police stop for domestic violence purposes, that is incorrect. Circumstances exist where actions amounting to less than a physical encounter would be sufficient to form the basis of a reasonable suspicion that a defendant had committed domestic violence.

¶ 21 Once a reasonable suspicion is reached by the originator of the information—in this case, the dispatcher—the responding police officer is entitled to rely on the information unless the officer's personal observations or interaction with the suspect present indications to the contrary. That is to say, if the suspect's actions are not inconsistent with the reasonable suspicion, the police officer may pursue the suspect and stop him or her immediately. *See Kaysville City v. Mulcahy*, 943 P.2d 231, 234 (Utah Ct.App. 1997) ("An officer receiving a dispatched message may take it at face value and act on it forthwith." (internal quotation marks omitted)).

¶ 22 Applying that standard to this case, we must determine whether Roybal's actions presented Sergeant Ledford with evidence contradicting the dispatcher's reasonable suspicion. Sergeant Ledford observed Roybal driving slowly and carefully and in a manner that appeared as though he were trying to avoid the police car. Although this behavior in and of itself is not conclusive, it does not disprove or contradict the reasonable suspicion that Roybal was driving under the influence, and therefore did not diminish Sergeant Ledford's ability to rely on the dispatcher's report and to pursue and detain Roybal.

## CONCLUSION

¶ 23 We conclude that the evidence of Roybal's intoxication observed by Sergeant Ledford during the traffic stop was properly admitted against Roybal. At the time of the stop, Sergeant Ledford was entitled to rely upon the 911 dispatch report. The 911 call by Roybal's girlfriend was of adequate reliability and detail to give the dispatcher a reasonable suspicion of Roybal's intoxication while driving, and Sergeant Ledford's own observations of Roybal's conduct did not contradict that suspicion. Thus, Sergeant Ledford was justified in stopping and questioning Roybal.

¶ 24 We therefore reverse the court of appeals and affirm the conviction by the district.

¶ 25 Chief Justice DURHAM, Associate Chief Justice DURRANT, and Justice PARRISH concur in Justice WILKINS' opinion.

NEHRING, Justice, dissenting:

¶ 26 I respectfully dissent because I believe that under the totality of the circumstances, Sergeant Ledford did not have reasonable suspicion to stop Mr. Roybal.

¶ 27 In order to make a lawful traffic stop, an officer must have reasonable articulable suspicion that the subject of the stop is involved in criminal activity. *See State v. Kohl*, 2000 UT 35, ¶ 11, 999 P.2d 7. The majority correctly notes that while the articulable facts supporting reasonable suspicion are "most frequently based on an investigating officer's own observations and inferences," in some circumstances, an officer may rely on other sources of information to make a stop, including 911 dispatch reports based on informant tips. *See supra* ¶ 14.

¶ 28 However, the fact that an officer receives information from police dispatch does not necessarily end the reasonable suspicion inquiry. Indeed, where "the investigation end[s] in arrest and the stop's legality [is] attacked, the State must—albeit after the fact—establish that adequate articulable suspicion initially spurred the dispatch." *Kaysville City v. Mulcahy*, 943 P.2d 231, 235 (Utah Ct.App.1997) (internal quotation marks omitted); *see also Salt Lake City v. Bench*, 2008 UT App 30, ¶ 14, 177 P.3d 655 ("To establish that adequate articulable suspicion spurred the dispatcher's broadcast, the prosecution must show that [the informant's] tip was reliable.").

¶ 29 We assess whether the dispatcher had reasonable suspicion based on the content of the information provided by the informant and its degree of reliability. *See id.* ¶ 7 (citing *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)). "Both factors—quantity and quality—are considered in the 'totality of the circumstances' analysis." *State v. Roybal*, 2008 UT App 286, ¶ 10, 191 P.3d 822 (quoting *White*, 496 U.S. at 330, 110 S.Ct. 2412). Although the reliability of a tip is based on the totality of the circumstances, we have traditionally

focused on three considerations: (1) the type of informant involved, (2) how much detail the informant provided about the observed criminal activity, and (3) any corroboration obtained through the police officer's personal observations. *See id.* ¶ 11; *see also Mulcahy,* 943 P.2d at 235–36.

¶ 30 As to the first consideration, I agree with the majority's statement that although Ms. McCaine—the supplier of the information to the dispatcher—had some personal involvement in this case as Mr. Roybal's live-in girlfriend, she is still an identified citizen-informant and is thus entitled to a presumption of reliability. *See supra* ¶ 19.

¶ 31 The majority's analysis of the second and third considerations is more troubling. The record indicates that Ms. McCaine called 911, upset after a verbal fight with her live-in boyfriend. When the dispatcher asked Ms. McCaine to tell her "exactly what [was] happening," Ms. McCaine replied, "[t]he person that's been living with me is an a—hole, and I want him the f— out of here." The dispatcher asked Ms. McCaine if she had been assaulted, to which Ms. McCaine responded, "just about, yes." However, a few moments later Ms. McCaine contradicted herself when she confirmed that no physical violence had occurred. The dispatcher then asked if her boyfriend had been drinking. Ms. McCaine responded, "We both have." When the dispatcher asked Ms. McCaine where her boyfriend currently was, Ms. McCaine replied, "[h]e's out putting stuff in his van ... He's going to be gone before you get here." The dispatcher asked Ms. McCaine what kind of car her boyfriend drove. Ms. McCaine told the dispatcher that he drove a white van and gave the dispatcher a partial license plate number. When asked where her boyfriend was going, Ms. McCaine stated, "I have no idea. He's heading south."

¶ 32 From this communication, the majority concludes that the dispatcher had reasonable suspicion that Mr. Roybal was driving under the influence. *See supra* ¶ 20. The majority reasons that since Ms. McCaine admitted to drinking with Mr. Roybal and "was noticeably intoxicated on the phone," "the dispatcher could make the reasonable infer-

ence that [Mr.] Roybal was similarly intoxicated, and now driving." *See id.*

¶ 33 I am troubled by the inference made by the majority. When the information Ms. McCaine gave to the dispatcher is examined in its totality, it reveals that Ms. McCaine provided little detail about the alleged criminal activity. *See State v. Case,* 884 P.2d 1274, 1279 (Utah Ct.App.1994) (stating that corroborating details based on a person's physical description "is not corroboration of criminal activity"). The information from the dispatcher established only that Mr. Roybal was in a white vehicle and that he had something to drink.

¶ 34 People drinking together can individually consume various amounts of alcohol, or no alcohol at all, and it is erroneous to assume that the mere fact that people are together means they have had the same amount to drink. As the court of appeals stated below, "the statement that a person has been drinking, by itself—with no other facts regarding the amount of alcohol consumed, the type of beverage consumed, or the period of time over which the person consumed the alcohol ... does not provide an adequate basis on which to rationally infer that the person has an alcohol level beyond the legally proscribed limit or that the person consumed alcohol to the extent that he or she could not safely drive a vehicle." *Roybal,* 2008 UT App 286, ¶ 15, 191 P.3d 822 (citations omitted).

¶ 35 Sergeant Ledford's personal observations further negate the "inference" that Mr. Roybal was driving under the influence. In response to the dispatcher's call, Sergeant Ledford located a white van not far from Ms. McCaine's house. Instead of stopping the van immediately, Sergeant Ledford followed Mr. Roybal as he drove. He observed no traffic violations. Instead, he observed that Mr. Roybal was traveling "slowly and carefully." Sergeant Ledford testified that based on his experience as an officer, this uniformly hyper-competent driving was an effort to avoid his police car.

¶ 36 According to the majority, this observation "does not disprove or contradict ... that [Mr.] Roybal was driving under the influence." *Supra* ¶ 22. I disagree.

¶ 37 Our court of appeals has soundly rejected the implication that the State can impute unlawful activity to hyper-cautious driving. In *Bench,* the court of appeals noted:

Safe, ultra-cautious driving, however, even if motivated by a desire to avoid police contact, does not, without more, create reasonable suspicion sufficient to justify a traffic stop. Simply put, a desire to avoid an encounter with police does not indicate that a person is driving while intoxicated or is otherwise engaged in criminal activity.

2008 UT App 30, ¶ 12, 177 P.3d 655. I would bestow the imprimatur of our court on this analysis from *Bench.* Although Sergeant Ledford had some information that Mr. Roybal may have been driving under the influence, the quantity and detail of this information was sparse, and its reliability was put into question when Sergeant Ledford's personal observations were inconsistent with the information. Thus, based on the totality of the circumstances in this case, I believe that Sergeant Ledford lacked the reasonable suspicion he needed to stop Mr. Roybal for driving under the influence.