**2026 UT App 21**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SHADIA REVUELTA,
Appellant.

Opinion
No. 20220357-CA
Filed February 12, 2026

Second District Court, Farmington Department
The Honorable Ronald G. Russell
No. 191700938

Scott L Wiggins, Attorney for Appellant

Derek E. Brown and Jeffrey D. Mann,
Attorneys for Appellee, assisted by law student
Rebecca Huber.[1]

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES GREGORY K. ORME and MICHELE M. CHRISTIANSEN
FORSTER concurred.

LUTHY, Judge:

¶1　Shadia Revuelta pled guilty to two counts of possession of a controlled substance with intent to distribute in the presence of a child. She now appeals, asserting that the magistrate who issued the search warrant that was executed on her home erred in finding probable cause. We reject Revuelta's argument and affirm her convictions.

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

BACKGROUND[2]

¶2    Officers in the Utah County Major Crimes Task Force (the Task Force) received an anonymous complaint that Revuelta was "involved in the use and distribution of illegal narcotics." Acting on this tip, they conducted surveillance on Revuelta's home in North Salt Lake. The officers observed that Revuelta "didn't leave very often" and "that she was home during times when most people were at work." They also saw that "the residence had several surveillance cameras." Additionally, they noted that Revuelta had two cars on her property, one with "a temporary tag" and another with a license plate from another state.

¶3    The officers also observed that the trash can on the side of Revuelta's home was full, leading them to believe that "trash day was soon," and they learned "that trash day was on Friday morning." The officers arrived early that Friday morning at Revuelta's home. They saw that the trash can was on the street, indicating that the trash inside had been "abandon[ed] for pickup," and they "took bags from the trash can." The officers then went to another location, emptied the bags, and found "correspondence for [Revuelta]," "a glass jar with high grade marijuana," and "a pen used to smoke illegal substances." When they opened the jar, it had a "strong odor of marijuana as well as a lot of marijuana shake still inside." A field test on the "green leafy . . . shake" yielded a positive result for marijuana.

¶4    Five days after the trash pull, one of the officers (Detective) submitted an affidavit for a search warrant for Revuelta's home. In that affidavit, Detective stated that he had received "specialized training . . . specific to controlled substances" from

---

2. Because Revuelta pled guilty, there was no trial. We therefore recite the facts based on the search warrant and supporting affidavit, the charging document, the preliminary hearing, the motion to suppress, and the hearing on that motion.

the police academy's drug abuse recognition program, including on "methods of use, sale, distribution, cultivation, manufacturing . . . , [and] identification of controlled substances." He noted that he had just attended a week-long course conducted by the Drug Enforcement Administration on "recent drug trends." He also recounted that he had "investigated numerous cases involving the use, packaging and paraphernalia associated with controlled substances."

¶5     Detective explained that law enforcement had received information that Revuelta was "involved in the use and distribution of illegal controlled substances." He outlined the findings from the surveillance and trash pull at Revuelta's home as described above. He further indicated that Revuelta being home when most people are at work is a pattern "common with persons involved in the drug culture as they often don't have jobs other [than] selling illegal substances and are only gone short periods of time." Detective stated that the use of surveillance cameras is "common with drug distributors," who use them "to keep constant watch . . . so they don't get robbed." Detective also indicated that it is "common for people involved in the drug culture to have vehicles with out-of-state plates as well as temporary tags" so they cannot be "easily tracked by law enforcement."

¶6     A magistrate approved the requested warrant the same day the affidavit was submitted. Nine days later, Detective and other members of the Task Force executed the warrant. During the resulting search, the Task Force found Revuelta counting cash on her bed. Her four-year-old son "was located in his bedroom inside the residence," and her infant daughter was "in a bedroom in her crib." The Task Force also found more than $8,500 in cash, a book containing names and debts, more than ten pounds of methamphetamine, drug paraphernalia and packaging, a sawed-off shotgun, and a substantial amount of marijuana, cocaine, and heroin.

¶7      Revuelta was charged with two counts of possession of a controlled substance with intent to distribute; two counts of endangerment of a child; five counts of possession or use of a controlled substance; one count of possession of drug paraphernalia; and one count of purchase, transfer, possession or use of a firearm by a restricted person. At her arraignment, she pled not guilty to each of these charges.

¶8      Subsequently, Revuelta moved to suppress the evidence obtained during the search. She argued that "the warrant was not supported by probable cause"—in part because the information in the affidavit was stale—and that "the officers who executed the warrant did not have a good faith belief that there was probable cause." The State contended otherwise. Following oral argument, the district court denied Revuelta's motion to suppress.

¶9      The court determined that the items found in Revuelta's trash, "along with the officers' additional observations, supported a finding of probable cause and justified the search warrant." The court also determined that the information in the affidavit was not stale. Finally, the court concluded that even if the information in the affidavit did not provide probable cause, the good faith exception to the exclusionary rule set forth in *United States v. Leon*, 468 U.S. 897 (1984), would apply and preclude suppression of the evidence obtained during the search.

¶10     After the court denied Revuelta's motion to suppress, she entered a conditional guilty plea to two counts of possession of a controlled substance with the intent to distribute in the presence of a child. As part of her plea agreement, she reserved the right to appeal the denial of her motion to suppress. Revuelta now exercises that right and appeals.

ISSUE AND STANDARDS OF REVIEW

¶11     On appeal, Revuelta asserts that the magistrate erred in determining that the affidavit provided probable cause to issue

the search warrant and, therefore, that the district court erred in denying her motion to suppress. "We review a denial of a motion to suppress as a mixed question of law and fact and will disturb the district court's factual findings only when they are clearly erroneous, but we afford no deference to the district court's application of law to the underlying factual findings." *State v. Hansen*, 2025 UT App 121, ¶ 25, 576 P.3d 1160 (cleaned up). Additionally,

> where a search warrant supported by an affidavit is challenged as having been issued without an adequate showing of probable cause, our review focuses on the magistrate's probable cause determination. In conducting this review, we assess whether the magistrate had a substantial basis for determining that probable cause existed. In making this determination, we afford the magistrate's decision great deference and consider the affidavit relied upon by the magistrate in its entirety and in a common sense fashion. On appeal, we affirm a magistrate's finding of probable cause based upon an affidavit only where the affidavit supports the magistrate's determination that there is probable cause to believe that evidence of a crime will be found in the place or places named in the warrant.

*State v. Walker*, 2011 UT 53, ¶ 13, 267 P.3d 210 (cleaned up).[3]

---

3. Revuelta also asserts that the district court erred in its determination that the good faith exception to the exclusionary rule applied in this case. Given our determination that the magistrate did not err in finding probable cause, we need not address Revuelta's argument regarding the good faith exception.

ANALYSIS

¶12    The Fourth Amendment prohibits "unreasonable searches and seizures," and it mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. "The Fourth Amendment guaranty against unreasonable searches and seizures interposes a magistrate between the investigating officer and the person who is the object of the search, and requires the magistrate, before issuing a search warrant, to review the affidavit submitted to determine whether it establishes probable cause." *State v. Deluna*, 2001 UT App 401, ¶ 11, 40 P.3d 1136 (cleaned up).

¶13    "Probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—that is not readily, or even usefully, reduced to a neat set of legal rules. Instead, probable cause determinations are governed by a totality-of-the-circumstances analysis." *State v. Roberts*, 2018 UT App 92, ¶ 8, 427 P.3d 416 (cleaned up). "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . , there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* (cleaned up). "Probable cause is a low standard. Indeed, the probable cause standard requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (cleaned up).

¶14    Revuelta contends that the warrant affidavit here did not provide probable cause for a search of her home for two reasons: (1) on its face, the information in the affidavit did not support a finding of probable cause and (2) even if the information in the affidavit otherwise supported a finding of probable cause, it had grown stale by the time the warrant was executed. To the contrary, and as explained more fully below, we conclude that the information in the affidavit did support a finding of probable cause and that it was not stale when the warrant was executed.

A.    The Information in the Affidavit Supported a Finding of Probable Cause.

¶15    The case of *State v. Jackson*, 937 P.2d 545 (Utah Ct. App. 1997), undergirds our conclusion that the information in the affidavit supported a finding of probable cause. Like this case, *Jackson* involved a search warrant issued on the basis of items found in a trash pull at the subject residence. *See id.* at 546–48. A police officer went to the home where the three defendants in the case resided and "obtained two garbage cans that were sitting at the side of the street in front of [the] home." *Id.* at 546. The officer "removed the two cans from the curb and took them to [another location,] where the contents of the cans were inspected." *Id.* "As a result of his search of both garbage cans, [the officer] found evidence of illegal drug use and possession, including marijuana stems and seeds, a marijuana cigarette, a small amount of marijuana indicative of personal use, and 'Zig-Zag' papers used for rolling marijuana cigarettes." *Id.* "These items were found inside a garbage can containing, among other items, a utility bill in the name of [one of the defendants] and a phone bill in the names of both [that defendant and one other defendant]." *Id.*

¶16    "On the basis of this and other information, the police sought a search warrant for [the] defendants' home . . . ." *Id.* "The requested warrant was issued," and "[b]ased upon the evidence of drugs and drug paraphernalia found during this search of their residence, [the] defendants were charged with various drug-related" crimes. *Id.* at 547. The defendants "moved to suppress the evidence obtained from the search, which motion was denied." *Id.* They then each entered conditional guilty pleas to two class A misdemeanors, "with each defendant reserving the right to challenge the trial court's ruling on the earlier suppression motion." *Id.*

¶17    In the resulting appeal, we "largely agree[d]" with the defendants that the particular information other than that obtained during the trash pull "should not have been considered

by the magistrate in making his probable cause determination."[4] *Id.* at 548. But we concluded that "even absent" that additional information, "the affidavit contained sufficient facts to support the magistrate's determination of probable cause." *Id.* In other words, we determined that the presence of marijuana stems and seeds, a marijuana cigarette, a small amount of marijuana indicative of personal use, Zig-Zag papers used for rolling marijuana cigarettes, and multiple bills addressed to one or more of the defendants in the garbage can outside the defendants' residence supported a finding of probable cause to search the residence. *See id.*

¶18   In arguing against that conclusion, the *Jackson* defendants asserted "that the facts set forth in the affidavit fail[ed] to dispel the possibility that the contraband was placed in the garbage cans by strangers or neighbors while the cans sat at the curb." *Id.* at 547. We rejected that argument by reasoning as follows:

> [The officer] found the contraband amongst garbage that included a utility bill in the name of [one defendant] and a phone bill in the names of both [that defendant and another defendant]. This fact tends to suggest that the marijuana came from inside [the] defendants' home, and was discarded by [the] defendants, along with other refuse from

---

4. The information that we largely agreed was "stale and irrelevant" in making a probable cause determination in *State v. Jackson*, 937 P.3d 545 (Utah Ct. App. 1997), was (1) a guilty plea by one of the defendants to possession of marijuana and drug paraphernalia at a third party's residence about a year and a half prior to issuance of the warrant and (2) an incident about a month and a half prior to issuance of the warrant where "several unidentified men entered [the] defendants' home without permission and held [the] defendants captive for several hours demanding drugs and money." *Id.* at 546–47.

the home, rather than by some unknown passer-by or neighbor.

*Id*.

¶19 We also rejected the argument that because "the affidavit failed to indicate when the containers were taken to the street," "the contraband could have been in [the] defendants' garbage can for weeks or months before [the] defendants took the garbage to the curb for collection," thus "seriously undercut[ting] the magistrate's determination of probable cause." *Id.* at 548. As to this argument, we explained,

> Although the affidavit does not state the specific day of the week when the city's garbage collectors were scheduled to dispose of the garbage at the residence, the magistrate could fairly infer, given the fact of weekly collection, that the contraband had not been lying around for longer than one week. Such potential lapse of time was not significant enough to bar the magistrate from concluding there was probable cause to believe that drugs would be found inside [the] defendants' home.

*Id.*

¶20 Our conclusion in *Jackson* that the trash pull evidence there supported a finding of probable cause to search the defendants' home demands the same conclusion regarding the similar trash pull evidence here and Revuelta's home—namely, that the glass jar with "a lot" of "high grade" marijuana shake inside, the "pen used to smoke illegal substances," and the correspondence addressed to Revuelta that were all found in the garbage at Revuelta's residence adequately supported the magistrate's finding of probable cause to search Revuelta's home.

¶21     Revuelta makes seven arguments against the foregoing conclusion. None of them are availing.

¶22     First, Revuelta argues that "[d]rugs by their very nature are usually sold and consumed in a prompt fashion" and, thus, that "a more probable inference" to be drawn from the presence of drugs and drug paraphernalia in the garbage outside her home was "that whatever drugs were previously in the residence had been consumed and discarded." But this argument is at odds with our conclusion in *Jackson* that the presence of drugs and drug paraphernalia in the garbage outside the defendants' home gave rise to a fair probability that similar contraband was still in the home. Additionally, the magistrate here could fairly infer that a glass jar with "a lot" of discarded marijuana shake still inside was not indicative of isolated or sporadic use but, rather, ongoing illegal possession.

¶23     Second, Revuelta argues that "it is impossible to tell when the marijuana shake and pen were put into the garbage" outside her home. "Depending on the household," she says, "the trash pull evidence could have been put in the garbage anywhere from one day to several weeks earlier," and "[t]he inability to tell when drugs were last in the home diminishes any inference that drugs were still in the home." In support of this argument, Revuelta asserts that the affidavit in this case "fail[ed] to provide any information or evidence as to the garbage collection system employed by the city in which [Revuelta] resided." However, contrary to Revuelta's assertion, the affidavit stated that the Task Force "found out that trash day was on Friday morning." And the magistrate could reasonably infer that this meant that trash collection in Revuelta's neighborhood normally occurred each Friday morning. In *Jackson*, we reasoned that, "given the fact of weekly collection," a magistrate can "fairly infer" that contraband found in a garbage can outside a home has "not been lying around for longer than one week." *State v. Jackson*, 937 P.2d 545, 548 (Utah Ct. App. 1997). We then concluded that "[s]uch potential lapse of time [is] not significant enough to bar" a finding of "probable

cause to believe that drugs [will] be found inside" the subject home. *Id.* In sum, Revuelta's second argument falls flat in light of our reasoning and conclusions in *Jackson*.

¶24 Third, Revuelta argues that her case is distinguishable from *Jackson* on other grounds. Specifically, she contends, "[T]he 'marijuana shake' and pen obtained during the trash pull in this case—unlike that in *Jackson*—do[] not demonstrate protracted and continuous use, which militates against any 'substantial basis' determination as to probable cause." Yet beyond that bare assertion, Revuelta offers no explanation for why we should treat the trash pull evidence in this case—which included marijuana and paraphernalia to facilitate its use—any differently from how we treated the trash pull evidence in *Jackson*—which also included marijuana and paraphernalia to facilitate its use. Thus, Revuelta's argument in this regard fails.

¶25 Fourth, Revuelta contends that because the affidavit in this case "provided no information as to whether the 'pen' . . . located in the trash bags had been tested for . . . any residue of illegal substances," "it is reasonable to infer that the 'pen' did not contain any such residue." She then asserts that this "information would have been important to a probable cause determination." While we agree that the mere presence of a potentially unused drug pen in Revuelta's trash likely would not have supported a finding of probable cause to search her home, the fact that the pen had been discarded and marijuana was found with it supports an inference that marijuana was being used inside the home.

¶26 Fifth, Revuelta contends that *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006), "is particularly instructive here." In *McPhearson*, the defendant was arrested on the porch outside his residence for assault. *See id.* at 520. Incident to the arrest, the police searched the defendant's pants pockets and discovered a quantity of cocaine. *See id.* Relying on the assault arrest and the cocaine in the defendant's pocket, the police obtained a warrant to search the defendant's home, where they found significant "quantities of

crack cocaine and firearms." *Id.* at 521–22. On appeal, the Sixth Circuit held that the affidavit submitted with the warrant application did not support a finding of probable cause because it "did no more than state that [the defendant], who resided at 228 Shelby Street, was arrested for a non-drug offense with a quantity of crack cocaine on his person." *Id.* at 524–25. "These averments," the court explained, did "not establish the requisite nexus between the place to be searched and the evidence to be sought." *Id.* at 524. The court concluded that "a suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause." *Id.* (cleaned up).

¶27　As an initial matter, we are not bound by Sixth Circuit caselaw. Moreover, we believe that the inferences that can be drawn from a drug-carrying suspect's arrest outside a particular residence are not coextensive with the inferences that can be drawn from the presence of drugs inside a trash can outside a particular residence, especially when the drugs in the trash can are mingled with garbage—such as personal correspondence—that appears to have been inside the home. For these reasons, *McPhearson* does not affect our analysis here.

¶28　Sixth, Revuelta argues that in ruling on her motion to suppress, the district court "failed to consider . . . that someone other than [Revuelta] could have disposed of the items obtained during the trash pull." In this regard, Revuelta notes that the affidavit "demonstrate[d] that the trash can was located on the east side of the home 'by the garage'—enabling anyone to access it"—and that the affidavit did not "provide any information as to whether the items located were found in the same trash bags or whether there were other bags in which nothing was found." We addressed a similar argument in *Jackson*.

¶29　There, we determined that the fact that the officer "found the contraband amongst garbage that included a utility bill . . . and a phone bill" addressed to one or more of the defendants

"tend[ed] to suggest that the marijuana came from inside [the] defendants' home, and was discarded by [the] defendants, along with other refuse from the home, rather than by some unknown passer-by or neighbor." *State v. Jackson*, 937 P.2d 545, 548 (Utah Ct. App. 1997). It is difficult for us to discern whether the contraband in this case was "amongst" garbage that included the correspondence addressed to Revuelta in the same way that the contraband in *Jackson* was "amongst" garbage that included the bills addressed to the defendants in that case. However, to the extent that the contraband here may not have been "amongst" the garbage containing the correspondence addressed to Revuelta in the way we contemplated in *Jackson*, the affidavit in this case included other evidence suggesting a tie between the contraband and Revuelta.

¶30 Specifically, the affidavit contained a reference to the anonymous complaint the officers received about Revuelta being "involved in the use and distribution of illegal narcotics." The affidavit also noted that the surveillance cameras, the cars with out-of-state and temporary tags, and Revuelta's staying "home during times when most people were at work" were all indicative of drug activity. This information was sufficient to support an inference that the drugs from the trash pull in this case came from Revuelta's home and not from an unknown passer-by or neighbor.[5]

---

5. The contribution toward probable cause made by the purported indicators of "drug culture" outlined by Detective was decidedly marginal. By itself, the fact that a parent of young children would be at home when most people are at work is unremarkable. Likewise, the use of security or surveillance cameras at personal residences is now commonplace. And any person who has recently relocated to Utah will likely have a vehicle or two with a temporary tag or an out-of-state license plate. Only the combination of these purported indicators (together with the

(continued…)

¶31    Finally, Revuelta argues that the affidavit "failed to establish any independent police corroboration of the [anonymous] complaint other than some vague references to observed circumstances the [officers] believed to be consistent with the 'drug culture'" and that the circumstances Detective identified as indicative of drug activity "would just as easily apply, if not more so, to law-abiding individuals operating in today's world." We agree that the anonymous complaint and the identified circumstances indicative of drug activity may not have been enough, on their own, to support a finding of probable cause. But together they buttressed the finding of probable cause, particularly by providing a basis to infer a connection between the contraband in the trash and Revuelta, as opposed to some unknown person. *See Illinois v. Gates*, 462 U.S. 213, 237–38 (1983) ("[Anonymous] tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise 'perfect crimes.' While a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not.").

¶32    For the foregoing reasons, we conclude that the warrant affidavit in this case supported the magistrate's finding of probable cause to search Revuelta's home.

B.    The Information in the Affidavit Was Not Stale.

¶33    Revuelta asserts that by the time the warrant was executed, the information in the affidavit had gone stale. We are not persuaded.

---

anonymous complaint) makes them useful. Even then, their utility here is limited to suggesting that the contraband in Revuelta's garbage can was not placed there by an unknown passer-by.

¶34 "Staleness issues usually arise when a significant lapse of time occurs between the discovery of information suggesting that evidence of the crime can be found at a particular locale and the magistrate's finding of probable cause or the execution of the warrant." *State v. Ranquist*, 2005 UT App 482, ¶ 11, 128 P.3d 1201 (cleaned up). However, "a mere passage of time does not necessarily invalidate the supporting basis for the warrant." *Id.* (cleaned up). Rather, "the court must make an individual determination based on the facts of the case and a variety of factors, including the length of time, the nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched." *State v. Fuller*, 2014 UT 29, ¶ 33, 332 P.3d 937 (cleaned up).

¶35 In *Ranquist*, the trial court "suppressed evidence obtained upon execution of a warrant issued on the basis of amphetamine residue found in [the defendant's] curbside garbage five days before the warrant was issued." 2005 UT App 482, ¶ 1. The warrant was executed eight days after it was issued. *See id.* ¶ 3. On appeal, we reversed, concluding that "[a]lthough the better practice would have been to seek a search warrant immediately upon the discovery of the amphetamine residue in [the defendant's] trash, . . . the passage of an additional five days [was] not fatal to a finding of probable cause." *Id.* ¶ 12. Given the similarity between the trash pull evidence in *Ranquist* and the trash pull evidence here, as well as the identical five-day lapse between the trash pull and the warrant application, and the nearly identical lapse—eight days in *Ranquist* and nine days here— between issuance and execution of the warrant, we see no principled basis upon which to distinguish this case and *Ranquist* on this point. We therefore conclude here, as we did there, that the passage of five days between the trash pull and the warrant application did not render the information upon which the warrant was based stale.

¶36    Revuelta pushes back by arguing that reliance on *Ranquist* in this context would be "misplaced" because the *Ranquist* court "did not address the entire period of time—from the search of the trash until execution of the search warrant—in concluding there was probable cause." In *Ranquist*, that entire period was thirteen days, *see id.*; here, it was fourteen days. Revuelta maintains that "any drugs [that may have been in her home] as indicated by the trash pull—by their very nature—would usually [have been] sold and consumed in a prompt fashion," thus rendering any probable cause that existed when the warrant was issued stale by the time the warrant was executed.

¶37    However, while the *Ranquist* court did not explicitly analyze the eight days between issuance and execution of the warrant in that case, the court's opinion makes clear that it was at least aware of that interval and still reversed the district court's grant of the motion to suppress. *See id.* ¶¶ 3, 13. Moreover, we agree with the State that "[t]he mere passage of time of an additional nine days . . . does not change the 'fair probability' that drugs would be found in the home of an individual who [appears, based upon probable cause, to be] using and distributing drugs."

¶38    For the foregoing reasons, we conclude that the information in the affidavit was not stale when the warrant was issued or when it was executed.

CONCLUSION

¶39    The information in the search warrant affidavit submitted by Detective supported the magistrate's finding of probable cause to search Revuelta's home, and that information did not become stale prior to execution of the warrant. We therefore affirm the district court's denial of Revuelta's motion to suppress.

———————